IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TERESA E. DOUGLASS, | ) |
| Plaintiff, | ) |
| vs. | ) Civil Action No. 07-685 |
| PENN HILLS BOROUGH, et al., | ) |
| Defendants. | ) |

AMBROSE, Chief District Judge

## OPINION AND ORDER

### Synopsis

Plaintiff Teresa E. Douglass asserted claims under 42 U.S.C. § 1983 against Penn Hills Borough, and Officers Anthony N. Diulus ("Diulus), Snyder and William Long ("Long"), alleging malicious prosecution and the use of excessive force. Defendant Long has been dismissed from the action by Order dated May 12, 2008 [Docket No. 53]. The parties agreed to voluntarily dismiss with prejudice counts II (malicious prosecution) and III (claim against Penn Hills Borough for Monell liability) of the Amended Complaint. [Docket No. 74.] Accordingly, all that remains before me is Count I of the Amended Complaint, alleging excessive force from the application of handcuffs by Defendants Diulus and Snyder.

Defendants have moved for summary judgment dismissing the action on the grounds that (1) there is no material issue of fact with respect to whether the officers' use of force was reasonable; (2) Defendants are entitled to qualified immunity; and (3) based on Plaintiff's willful

1

expungement of the police files at a time when a civil action was being contemplated. For the reasons set forth below, I deny Defendants' motion for summary judgment.

## I. Applicable Standards

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. Internat'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir. 1987). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific

facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

**II. Relevant Factual Background**

On May 24, 2005, Plaintiff had an adverse reaction to a prescription medication which she had ingested earlier in the day, and began hallucinating. (Pl. Response to Def.'s Concise Statement of Material Facts [Docket No. 77], at ¶ 3.) She suffered disorientation, paranoia, anxiety and extreme discomfort as a result of the medication. (Id.) While Plaintiff claims to have a good memory of the events of the day, she testified that there were certain "time periods" that she does not recall. (Id. at ¶ 4.) Plaintiff further testified that, in the three years since this occurred, she'd had time to "rethink all the different events that occurred" and believes she has a better memory of the events today than nearer in time. (Id. at ¶ 37.)

According to Plaintiff's deposition testimony, while vacuuming earlier that day, she placed two guns which had been stored under a sofa cushion into her purse. (Id. at ¶ 5.) She began to feel unwell, with a loss of balance, so she stopped vacuuming and took some prescription medication. (Id. at ¶ 6.) About an hour later, she became overwhelmed with paranoia, and felt hot, dizzy and anxious. (Id. at ¶ 7.)

Plaintiff tried to open the front door of the house but could not do so in her disoriented condition. Instead, she exited the house through the dining room window, taking her purse containing the revolvers with her. (Id. at ¶¶ 8-9.) Plaintiff later told her husband that she had been seeing things and hearing things about somebody chasing her, specifically her husband's ex-wife and possibly her own brother, and that she thought someone was chasing her out in the street. (Id. at ¶ 61.) Neighbors who witnessed her behavior in the street testified that she was

acting disoriented, talking to herself, waving a gun, ducking behind cars, and foaming at the mouth. (Id. at ¶¶ 55, 58, 70, 88, 96, 98.) Plaintiff does not recall pulling a gun out of her purse or whether she was hallucinating. (Id. at ¶¶ 12, 13.)

Defendant Officers Diulus and Snyder arrived at the scene in response to 911 calls regarding a woman in the street with a firearm. (Id. at ¶ 116.) Diulus observed a woman standing in the roadway and saw her throw a silver weapon in her hand into a patch of weeds on her left. (Id. at ¶ 118.) Both Diulus and Snyder testified that, after she threw the gun, she started to run in the opposite direction. (Id. at ¶¶ 119, 149.) The officers intercepted her between their two police cars, with Plaintiff coming to a stop against Diulus' car. (Id. at ¶¶ 120, 150.) According to the officers, Plaintiff was acting irrationally, making nonsensical comments, foaming at the mouth, sweating profusely and thrashing around. (Id. at ¶¶ 121, 152.)

Due to her behavior, the officers decided to take her down to the ground to restrain her. (Id. at ¶¶ 122, 153.) Plaintiff landed on her stomach with her hands underneath her. (Id. at ¶¶ 123, 154.) The officers pulled her hands from under her and cuffed them behind her back. (Id.) Officer Diulus, who applied the cuffs, testified that he double-locked the cuffs so that they could not tighten further. (Id. at ¶ 125.) Plaintiff continued to speak nonsensically, was kicking her legs and struggling. (Id. at ¶¶ 126, 155.) At this point, Defendants lifted Plaintiff by each taking one arm, and placed her in the patrol car. (Id. at ¶¶ 127, 155.)

Plaintiff's version of her initial encounter with the Defendants differs. According to Plaintiff, she did not realize that the police car had been called for her, and ran away so that it could proceed down the street. (Pl. Dep. [Docket No. 70-3], at 141.) She was simultaneously tackled to the ground as one officer told her to get down. (Id. at 147.) Plaintiff denies resisting

arrest, and explained that she was merely trying to reposition herself to get comfortable after they had tackled her. (Id. at 151.) The officers then handcuffed her and threw her into the police car. (Id. at 150.) Plaintiff immediately began screaming for the officers to loosen the handcuffs. (Id. at 154.) Witnesses at the scene corroborate that Plaintiff was tackled to the ground by the Defendants, that she began complaining of pain, that she was "squirming" on the ground, and that she was thrown, or placed roughly, into the police car. (See, W. Douglass Dep. [Docket No. 70-4], at 45-47; Y. Williams Dep. [Docket No. 70-6], at 39, 45, 46; R. Williams Dep. [Docket No. 70-5], at 24-25.)

There is no dispute that Plaintiff continued to scream, or at least complain loudly, that the handcuffs were too tight after being placed in the police car. (Docket No. 77, at ¶¶ 22, 78, 90, 132.) After a minute or so, according to Plaintiff's husband, Defendants went over to the police car to check whether the handcuffs were too tight. (Id. at 49.) Diulus testified that he turned Plaintiff around in the car, checked the cuffs, opened them and closed them, checked the movements of the wrists to be consistent with normal practice, and again double-locked the cuffs. (Diulus Dep., [Docket No. 70-9], at 54.) Mrs. Williams, a neighbor witnessing the event, saw Diulus enter the vehicle, and testified that Plaintiff became quiet and remained quiet for the remaining approximately fifteen minutes until the police car left the area. (Docket No. 77, at ¶ 91.)

Plaintiff and her husband dispute the testimony of Diulus and Mrs. Williams. According to Plaintiff, she felt Diulus touch the cuffs, they continued to click until they couldn't click anymore, and they continued to tighten on her wrists. (Pl. Dep., at 154.) She did not feel Diulus unlock the cuffs. (Id.) Plaintiff testified that she continued to feel intense pain and continued to

5

scream at the top of her lungs. (Id. at 155-56.) Mr. Douglass testified that, whatever Diulus did, his wife was "still in agonizing pain." (W. Douglass Dep., at 65.)

Defendants transported Plaintiff to Forbes Regional Hospital, based on the indicia that she was having some type of episode. (Docket No. 77, at ¶ 140.) Diulus and Snyder testified that Plaintiff continued to act irrationally on the drive to the hospital, to "rant and rave" and speaking "a lot of nonsensical information." (Diulus Dep. at 63; Snyder Dep. at 27.) According to Plaintiff, she spent the entire ride to the hospital "screaming the whole time, and it was - it was a rough ride." (Pl. Dep. at 168-69.) When Plaintiff arrived at the hospital, she continued to scream and plead with Diulus to take the handcuffs off. (Id. at 170-71.) It was not until hospital security arrived ten minutes later that the handcuffs were removed. (Id.)

The hospital records reflect that when Plaintiff arrived at the hospital, she was not wearing shoes, was disheveled with "foaming white substance around mouth." (Docket No. 80-3 at 17.) She was screaming "get these off me," which Emily Hayes, a social worker at the hospital, interpreted to refer to the handcuffs. (Id. at 1.) She appeared "very nervous" and did not answer questions when asked. (Id. at 18.) Plaintiff was evaluated by the emergency room physician, Dr. Michael Garfinkle. (Id. at 14.) Dr. Garfinkle noted that "[t]he patient does have some ecchymosis at the distal wrists from the handcuffs. Full range of motion of the wrists." (Id. at 15.)[1] His physician record form indicates "none" in the quality of pain category. (Id. at 19.) Plaintiff, however, claims that her wrists were bleeding when she arrived at the hospital. (Docket No. 77, at ¶ 30.) Plaintiff's urine screen performed at admission tested positive for cocaine

---

[1] Ecchymosis means a bruising underneath the skin. Dorland's Illustrated Medical Dictionary, 24th Ed. (W.B. Saunders Co. 1965).

metabolites, although Plaintiff denies having taken cocaine. (Id. at ¶175.)

Although the timing is not entirely clear, Plaintiff was further evaluated by Dr. Abdul Q. Khan, the attending physician at Forbes Regional Hospital. (Docket No. 80-3, at 5.)[2] Dr. Khan noted that "[t]he patient was complaining of severe pain around her wrist." (Id.) He noted that she had "superficial abrasions and moderate degree of swelling on both wrists with limited range of movements, flexion, extension as well as abduction and adduction." (Id.) He further noted: "check x-rays of her wrist. She may need consultation due to the severe pain and swelling around the wrist." (Id. at 6.) Nursing notes from May 26, 2005, the day of Plaintiff's discharge, indicate that Plaintiff was complaining of pain, six on a scale of ten, in both hands and wrists, numbness and tingling in both hands radiating up her forearm. (Id. at 22.) Both of her wrists were swollen and tender to the touch, although no abrasions were noted. (Id.) An MRI was performed and Plaintiff was given wrist braces to wear. (Id.) Plaintiff was discharged later that day. (Id.)

Plaintiff had a prior history of wrist injuries. On March 17, 1998, Plaintiff visited her primary care physician at the time, Dr. LaDonna Fuge. (Docket No. 77, at ¶ 171.) The notes from that visit indicate that Plaintiff was there "for right wrist injured at work 3/4/98." (Id.) Plaintiff complained of "tenosinovits - wrist with pronate/supinate" and "severe tenderness at carpal bones and the differential diagnosis is 'wrist pain.'" (Id.) Moreover, notes made by Marlene Ross, an occupational therapist who treated Plaintiff at Forbes Hospital on June 7, 2005, after the incident at issue, indicate that Plaintiff informed Ms. Ross that she "fell on outstretched hands" and that "problems with her medication contributed to her unsteadiness which caused the

---

[2]Dr. Khan's report appears to document her condition on May 25 or May 26, 2005, since it indicates that she "was seen the next morning and was doing well." (Id.) However, the report is undated and was not dictated until a month later, on June 20, 2005. (Id. at 6.)

7

fall." (Id. at ¶ 173; Docket No. 70-17.)

Plaintiff sought treatment from Three Rivers Orthopedic Associates on November 29, 2005, complaining of bilateral hand numbness and tingling. (Docket No. 77-2, at 2.) Nerve conduction studies showed mild carpal tunnel symptoms. (Id.) Plaintiff underwent carpal tunnel decompression surgery on January 25, 2006 for one wrist and May 1, 2006 for the other wrist. (Id.) The surgery was successful and Plaintiff returned to work on July 25, 2006. (Id.) Dr. Paul Resnick, her orthopedist, concluded:

> She relates this numbness, tingling and wrist discomfort to being handcuffed when she was stopped by police. The question is could this be caused by the initial incident and I think it is possible that it could be based on time she was in the handcuffs and the position she was in. I think more likely though she had probably a mild underlying carpal tunnel that was aggravated by this incident and that is when she became more symptomatic.

(Id. at 3.) In a letter written at the request of Plaintiff's counsel, Dr. Khan, her primary care physician, also concludes "with a reasonable degree of medical certainty that Miss Douglas[s] sustained contusion of both wrists due to tight handcuffs by police, she developed bilateral carpal tunnel syndrome after the incident and had to undergo surgery to fix the problem." (Id. at 1.)[3]

Defendants submitted the report of Dr. Robert M. Wettstein, a non-treating physician who evaluated Plaintiff's medical records, police department reports, the pleadings herein and Plaintiff's deposition transcript. (Docket No. 70-21.) Dr. Wettstein concluded that Plaintiff's delirium during the May 24, 2005 incident may have resulted in an altered, distorted, impaired or even obliterated memory. (Id. at 4.) "In their attempt to later reconstruct what happened to them during the delirium, individuals with earlier delirium episodes sometimes confabulate the earlier

---

[3]Dr. Khan was not aware that Plaintiff had seen her prior primary care physician with a complaint of wrist injury and pain. (Id.)

8

events." (Id.)

Finally, Defendants submitted the expert report of Dr. Steven E. Kann of Tri-State Orthopaedics & Sports Medicine, Inc. (Docket No. 70-15.) Dr. Kann performed a review of Plaintiff's medical records. Dr. Kann noted that "[t]he emergency room records of [the triage nurse and emergency room physician] do not delineate any subjective pain complaints whatsoever and certainly no complaints consistent with median nerve injury or carpal tunnel syndrome." (Id. at 2.) He concluded:

> The physical abnormalities noted on Ms. Douglass, which were basically superficial abrasions and some ecchymosis, are observations that are consistent with an individual struggling and thrashing about in their handcuffs as opposed to the handcuffs being applied in too tight of a manner. If handcuffs are applied in too tight of a manner, this leads to injury to the dorsal radial sensory nerve. Ms. Douglass throughout her medical care never had any complaints or notations of any abnormalities in her dorsal radial sensory nerve. The dorsal radial sensory nerve would be the first anatomic structure and certainly the first nerve structure that would have any abnormalities as a result of handcuffs being placed in too tight of a fashion. The medical records thus do not support any evidence whatsoever of the handcuffs being too tight.

(Id. at 4.)

### III. Defendants' Motion for Summary Judgment

#### A. Excessive Force

"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." Kopec v. Tate, 361 F.3d 772, 776 (3d Cir.), cert. denied, 543 U.S. 956 (2004). Here, there can be no dispute that handcuffing and arresting Plaintiff constituted a Fourth Amendment seizure. The issue becomes whether Defendants' seizure was unreasonable.

"The test of reasonableness under the Fourth Amendment is whether under the totality of

the circumstances, the officers actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent and motivations. 361 F.3d at 776 (citations omitted). "Factors to consider in making a determination of reasonableness include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. "A court in making a reasonableness assessment also may consider the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Id. at 776-77. "Reasonableness under the Fourth Amendment should frequently remain a question for the jury; however, defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." Id. at 777.

In Kopec, the Third Circuit held that handcuffs that are placed excessively tight, coupled with an officer's failure to respond to requests to loosen the cuffs for ten minutes and resultant injury to the wrists, establishes an unreasonable use of force in violation of the Fourth Amendment. 361 F.3d at 777. However, the Third Circuit cautioned that "this opinion should not be overread as we do not intend to open the floodgates to a torrent of handcuff claims." Id. In a subsequent opinion in Gilles v. Davis, 427 F.3d 197, 207-08 (3d Cir. 2005), the Third Circuit affirmed the district court's grant of summary judgment for the defendants on the excessive force claim, where, despite several complaints by the plaintiff that the cuffs were too

10

tight, "obvious visible indicators of [the plaintiff's] pain were absent," the plaintiff demonstrated "no expression or signs of discomfort at the time he was handcuffed," and the plaintiff did not "seek or receive medical treatment after the fact." See also, Benckini v. Coopersburg Borough, 2008 WL 2156713, at *7 (E.D. Pa. May 21, 2008) ("[E]ven if [the plaintiff] did complain about discomfort from the handcuffs, without more (of which [the plaintiff] articulates nothing), this claim of excessive force cannot survive on this theory of liability.")

The facts of this case fall somewhere in between these two extremes. In Tate v. West Norriton Township, 545 F. Supp.2d 480, 483 (E.D. Pa. 2008), the plaintiff felt the handcuff on his left wrist tighten after he was placed in the patrol car. He yelled three times that the cuff was too tight, but the officers did not respond to his complaints. Id. The cuffs remained on his wrists for a total of four minutes, and the plaintiff fell to the ground in pain when they were removed. Id. His wrist became swollen and discolored, he was treated at the hospital for wrist contusions and given a splint and physical therapy. Id. at 484. The district court denied the defendant's motion for summary judgment, finding that "[t]he instant facts are perhaps not as egregious as those seen in Kopec, but they come close enough to be governed by the rule of that case." Id. at 489; see also, Pack v. Stofko, 2008 WL 2456033, at *2 (W.D. Pa. June 17, 2008) (denying summary judgment on excessive force claim where the plaintiff repeatedly asked the officer to loosen the cuffs, the cuffs left visible marks and caused bleeding, and the plaintiff continued to suffer numbness and tingling in his fingers as a result); Clay v. Good, 2008 WL 2681848, at *1 (M.D. Pa. July 1, 2008) (deny summary judgment where inebriated plaintiff told officer on multiple occasions that the cuffs were too tight, his hands appeared dark red while cuffs were in place, and the plaintiff sought treatment for numbness in wrist and thumb).

Here, as detailed above, Plaintiff has submitted evidence that she repeatedly complained, if not screamed, for the Defendants to loosen her cuffs. Hospital records indicate that Plaintiff's wrists became swollen and bruised. Plaintiff was given splints and physical therapy, and ultimately required carpal tunnel surgery. These facts clearly support the validity of Plaintiff's claim of excessive force in violation of the Fourth Amendment.

However, the evidence in support of Defendants' case is also strong. Diulus checked on Plaintiff's cuffs within a minute or so of her complaint. At least one witness testified that Plaintiff calmed down shortly thereafter. Plaintiff was in the throes of a psychotic episode at the time of the arrest, including incoherence, hallucinations and foaming at the mouth. The hospital records from the time of her admission show no complaints of pain and indicate bruising more consistent with Plaintiff's struggling against the handcuffs, rather than excessive tightness. Thus, if Defendants did believe that the cuffs were applied properly, as they have stated, the condition of Plaintiff's wrists while in custody may have supported their evaluation. In addition, Plaintiff later explained to her physical therapist that the pain in her wrists stemmed from a fall on outstretched hands, and she had seen a doctor with complaints of wrist pain prior to her arrest.

On a motion for summary judgment, I am obligated to view the evidence in the light most favorable to the party opposing the motion, in this case Plaintiff. Given the significant factual disputes raised by the evidence submitted herein, I am compelled to deny summary judgment and leave resolution of this issue to the jury.

### B. Qualified Immunity

Defendants argue that they are entitled to qualified immunity because there was no Fourth Amendment violation, and, even if there were, Defendants made a reasonable mistake as to what

the law requires. More specifically, Defendants argue that they could not have known that the law "would be extended to require multiple checks upon the repeated complaints of a delusional, psychotic Section 302 candidate, after an officer checked the cuffs on first notice of the complaints and found no problem, and as the suspect immediately complained about the cuffs, not any pain, at the hospital." (Def. Reply Br. at 5.)

A determination as to whether Defendants are entitled to qualified immunity requires a two-step inquiry. Kopec, 361 F.3d at 776. "First, the court must consider whether the facts alleged, taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right." Id. If a constitutional violation is established, then the court must determine whether the right at issue was clearly established. Id. "The relevant dispositive inquiry in making this determination is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (citations omitted). "At the summary judgment stage, a ruling that the qualified immunity defense applies is proper where a reasonable juror, viewing the facts in the light most favorable to the plaintiff, could not find that a violation of the plaintiff's clearly established constitutional rights occurred." Tate, 545 F. Supp.2d at 485 (citing Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000)).

I have already held in subpart A above that questions of fact preclude summary judgment as to whether Defendants used excessive force in handcuffing Plaintiff. Therefore, for purposes of qualified immunity, Plaintiff has demonstrated a violation of a constitutional right. With respect to the second step of the analysis, the Third Circuit held in Kopec that "the right of an arrestee to be free from the use of excessive force in the course of his handcuffing clearly was established when [the officer] acted in this case, and that a reasonable officer would have known

13

that employing excessive force in the course of handcuffing would violate the Fourth Amendment." Id. at 778. Accordingly, and again viewing the facts in the light most favorable to the Plaintiff, as I am required to do, the defense of qualified immunity is not available to Defendants. See also, Tate, 545 F. Supp.2d at 490 (rejecting qualified immunity defense where the court also denied summary judgment on excessive force claim).

**C. Expungement**

Defendants renew their argument that Plaintiff's expungement of her criminal record, including the police records and index thereof, at a time when Plaintiff was contemplating this civil action, warrants the sanction of dismissal of the action. Plaintiff argues that Defendants have failed to identify any relevant document destroyed as a result of the expungement, and that, in any event, dismissal is too drastic a sanction. Because I disagree that the remedy sought by Defendants is appropriate, I deny Defendants' motion for summary judgment based on Plaintiff's expungement of her criminal record.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Ogin v. Ahmed, 563 F. Supp.2d 539, 542 (M.D. Pa. 2008) (internal quotations omitted). "A showing of spoliation may give rise to a variety of sanctions: (1) dismissal of a claim or granting judgment in favor of a prejudiced party; (2) suppression of evidence; (3) an adverse inference, referred to as the spoliation inference; (4) fines; and (5) attorneys' fees and costs." Paramount Pictures Corp. v. Davis, 234 F.R.D. 102, 110-11 (E.D. Pa. 2005). "There is no rule of law mandating a particular sanction upon a finding of improper destruction or loss of evidence; rather, such a decision is left to the discretion of the Court." Id. at 111.

The Third Circuit has set forth three factors to consider in determining whether a sanction for spoliation is appropriate: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and where the opposing party is seriously at fault, will serve to deter such conduct by others in the future. Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994). Moreover, "[a] sanction that has the drastic result of judgment being entered against the party who has lost or destroyed evidence must be regarded as a 'last resort,' to be imposed only if no alternative remedy by way of a lesser, but equally efficient sanction is available." Baliotis v. McNeil, 870 F. Supp.2d 1285, 1289 (M.D. Pa. 1994).

Defendants have cited no cases in this Circuit where courts have granted summary judgment dismissing civil actions brought after a Plaintiff has expunged her relevant criminal record. The Missouri and New Jersey cases relied upon by Defendants, (Def. Mem. at 18), address those states' statutes barring expungement of arrest records when a civil action is pending. Even if Pennsylvania had a similar statute, none of the cases involved a motion for summary judgment dismissing a civil action based upon the prior expungement of a plaintiff's criminal record.

Examining the factors set forth by the Third Circuit, the undisputed evidence shows a high degree of fault on Plaintiff's part in seeking the expungement at a time when she was contemplating a civil action against Defendants. However, I do not feel that Defendants have demonstrated a sufficient degree of prejudice to warrant a sanction of dismissal. While the expunged records may have contained the accounts of other officers at the scene, in particular

15

now-deceased Officer Long, Defendants are not left unable to defend the action. Indeed, Defendants have the arrest records written by Diulus, the testimony of Diulus and Snyder, as well as the testimony of numerous other witnesses at the scene. Defendants' mere conjecture that the expunged records may have contained exculpatory evidence does not rise to a level warranting dismissal.

Based on the record before me today, it appears that a sanction less than dismissal may be appropriate. However, since Defendants have not sought a lesser sanction, and Plaintiff has not had the opportunity to respond to such a request, I will reserve Defendants' right to seek a lesser sanction for spoliation prior to or at the time of trial.

## CONCLUSION

The Defendants' motion for summary judgment is denied. In connection with the trial of this action, Defendants may seek sanctions based on Plaintiff's expungement of her criminal record.

## ORDER OF THE COURT

AND NOW, this 18th day of February, 2009, after careful consideration, and for the reasons set forth in the accompanying Opinion, Defendants' motion for summary judgment [Docket No. 69] is denied.

A settlement conference is scheduled for February 24, 2009 at 12:45 p.m. before the undersigned. Counsel are to have settlement authority and parties are to be present or available by telephone. Position letters are to be faxed three (3) days prior to the conference.

BY THE COURT:

/s/Donetta W. Ambrose
Donetta W. Ambrose,
Chief U.S. District Judge